FILED
2011 Jul-29 PM 06:11
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **EDWIN PUTMAN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:09-cv-2555-AKK** |
| **ERIC SHINSEKI, Secretary,** | ) | |
| **Department of Veterans Affairs,** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Edwin Putman ("plaintiff"), filed this action against Eric Shinseki,
Secretary, United States Department of Veterans Affairs ("defendant"), on
December 18, 2009, alleging discrimination and retaliation in violation of Title
VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").
Doc. 1.  In his more than twenty years of employment with defendant, plaintiff has
filed several Equal Employment Opportunity ("EEO") complaints accusing
defendant of discrimination and retaliation.  Although this court takes seriously
the protections afforded to individuals under Title VII and other employment laws,
based on this record, plaintiff has failed to establish his claims.  Therefore, for the
reasons set forth below, summary judgment is GRANTED on all claims.

# I.  PROCEDURAL HISTORY

On December 18, 2009, plaintiff filed a single-count complaint with this court alleging retaliation based primarily on what he now describes as "The Sixth Incident."  Doc. 1 ¶¶ 7-22.  When defendant filed its first Motion for Summary Judgment or, Alternatively, To Dismiss for Failure to State a Claim on February 18, 2010, doc. 3, plaintiff filed an amended complaint the next day that added other incidents he now describes as the "First," "Second," "Third," "Fifth," and "Seventh" Incidents.[1]  Doc. 6 ¶¶ 10-51.  In addition to the original retaliation count, plaintiff added gender and race discrimination claims.  Id. ¶¶ 52-59.  On March 2, 2010, defendant filed a Second Motion for Summary Judgment and to Dismiss for Lack of Jurisdiction.  Doc. 7.  On July 26, 2010, this court granted defendant's motion with regard to plaintiff's claims premised on certain facts described as part of "The Seventh Incident," and denied the motion with regard to "The First Incident" through "The Sixth Incident."  Docs. 19 and 20.  After conducting discovery, on April 22, 2011, defendant filed its Third Motion for Summary Judgment.  Doc. 40.  The motion is fully briefed, docs. 46 and 51, and is ripe for this court's review.

---

[1]Plaintiff omits a "Fourth Incident" in his amended complaint.

2

## II.  MOTION TO STRIKE

Before addressing the motion for summary judgment, the court will first address defendant's motion to strike some of the evidentiary materials plaintiff submitted in opposition to summary judgment.  Doc. 53.  Defendant has moved to strike plaintiff's exhibits four through ten because they are unsigned declarations. Plaintiff has now sought leave to substitute the signed versions.  Doc. 52. Therefore, the court makes an exception to its submission schedule to ensure that it has all of plaintiff's evidence in considering the summary judgment motion. Defendant asserts also that these declarations proffer testimony that is vague, speculative, and generally not relevant to the claims in this case.  To the extent it is relevant, the court will consider the evidence because it purports to undermine defendant's articulated reasons for the adverse employment actions plaintiff challenges.  Accordingly, defendant's motion to strike, doc. 53, is DENIED, and plaintiff's motion to substitute exhibits, doc. 52, is GRANTED.

## III.  SUMMARY JUDGMENT STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of

3

summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (quotation marks and citation omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Id*. However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).

## IV.  FACTUAL BACKGROUND[2]

Plaintiff, a Caucasian male staff pharmacist employed by the Birmingham Veterans Administration Medical Center ("BVAMC"), doc. 6 ¶ 8; doc. 42-1, plaintiff dep., at 10, alleges race and gender discrimination and retaliation with regard to certain incidents from 2006 to 2009.  Doc. 6 ¶¶ 10-51.  Plaintiff has now clarified that he is asserting a claim of race and gender discrimination based solely on "The First Incident," and a retaliation claim based on "The Second Incident" through "The Seventh Incident."[3]  Doc. 46, at 32.

### A.    Plaintiff's Employment at the BVAMC

Plaintiff has worked as a staff pharmacist at the BVAMC since 1989.  Doc. 6 ¶ 8; Doc. 42-1, plaintiff dep., at 10.  Pharmacy employees have three levels of supervision.  Doc. 42-1, plaintiff dep., at 13-14.  At all relevant times, plaintiff's third-level supervisor was Chief of Pharmacy Sloan Harper ("Harper"), a Caucasian male.  Doc. 6 ¶ 9; Doc. 43-1, Harper EEO sworn stmt., at 7; Doc. 43-3, Harper dec. ¶ 1.  Dan Holder ("Holder"), a Caucasian male, was Assistant Chief of

---

[2]The facts are presented in the light most favorable to plaintiff.

[3]This differs from plaintiff's amended complaint, which alleged race and gender discrimination as well as retaliation with regard to "The First Incident," while only alleging retaliation with regard to the remaining incidents.  Doc. 6 ¶¶ 53, 57, 61.  Additionally, although he references a "pattern and practice" claim in relation to his retaliation cause of action, doc. 6 ¶ 61, plaintiff has now clarified that he does not seek and never intended to seek a "pattern and practice" claim.  Doc. 46, at 32.

Pharmacy from 2006 to 2007, and was plaintiff's second-level supervisor during that period.  Doc. 6 ¶ 9; Doc. 43-4, Holder EEO sworn stmt., at 4-5.  Prior to her promotion to Assistant Chief of Pharmacy in 2008, Monica Sfakianos ("Sfakianos"), a Caucasian female, was a Distributive Pharmacy Supervisor and was plaintiff's first-level supervisor.  Doc. 43-7, Sfakianos dep., at 14. Sfakianos became plaintiff's second-level supervisor in 2008 when defendant promoted her to Assistant Chief of Pharmacy.  Doc. 42-1, plaintiff dep., at 20.  Additionally, Christy Scott ("Scott"), a Caucasian female, was the Administrative Officer for the pharmacy at all times relevant to this matter.  Doc. 43-8, Scott EEO sworn stmt., at 6-7.

**B.      Plaintiff's Prior EEO Activity**

On July 18, 2002, four years before the first set of incidents he complains about in this case, plaintiff filed an EEO complaint accusing Harper and Holder of discrimination.[4]  Doc. 6 ¶ 9; Doc. 42-1, plaintiff dep., at 26-28, 64, 85-

---

[4]Under defendant's policies and the applicable Equal Employment Opportunity Commission ("EEOC") regulations, an employee who believes a supervisor has mistreated him must first approach a designated EEO counselor within the agency within a particular time frame. *See* 29 C.F.R. § 1614.105(a)(1)(2005).  EEO counselors are authorized to attempt to settle grievances informally, and are required to advise the employee of his rights and responsibilities in the EEO process, including his right to file a more formal agency complaint with an EEO officer should the informal attempt fail.  *See* 29 C.F.R. § 1614.105(b).  The filing of a formal agency complaint triggers an investigation by the agency, *see* C.F.R. § 1614.108(b), and upon the completion of the investigation, the employee has the right to request a hearing and decision on his complaint from an EEOC administrative judge, who will submit recommendations to the

86, 111.  Plaintiff's next identified protected activity occurred on September 13, 2006, when he contacted an EEO counselor regarding some of the matters in this case.  Doc 6 ¶ 31; Doc. 42-1, plaintiff dep., at 27; Doc. 44-3 (EEO Counselor's Report).

C.    **Facts Relevant to Plaintiff's Discrimination Claim: "The First Incident"**

"The First Incident" involves a physical altercation plaintiff had with a co-worker, Carol Prewitt ("Prewitt"), an African-American female, on July 19, 2006, and which resulted in Harper proposing to suspend plaintiff for five days for workplace violence.  Doc. 6 ¶¶ 10, 14; Doc. 42-1, plaintiff dep., at 73-74; Doc. 43-12 (Notice of Proposed Suspension); Doc. 44-1 (Notice of Suspension).  The incident started as a verbal confrontation and escalated to shoving and grabbing.  Doc. 6 ¶ 13.  Shortly thereafter, Prewitt reported the incident to her team coordinator, Joe Santoro, who prepared a written report.[5]  Doc. 43-9 (Santoro Report).  Prewitt also prepared a written report, doc. 43-10 (Prewitt Report of Contact), which she amended twice.  Doc. 43-2, Harper dep., ex. 5.  In contrast,

---

agency, or may request an immediate final decision from the agency.  *See* 29 C.F.R. § 1614.108(f).  After a final written agency decision on the matter, the employee may either appeal to the EEOC or file a civil action within a particular time frame.  *See* 29 C.F.R. § 1614.407.

[5]The BVAMC's workplace violence policy requires that employees report violent incidents immediately.  Doc. 43-11 (Workplace Violence Prevention Policy).

plaintiff only submitted a written report when Scott asked him to do so the

following day.  Doc. 42-3, plaintiff EEO sworn stmt., at 49-51; Doc. 42-1, plaintiff

dep., at 80-81; Doc. 43-6, Sfakianos EEO sworn stmt., at 7-10; Doc. 43-1, Harper

EEO sworn stmt., at 10-12; Doc. 43-7, Sfakianos dep., at 26.  After reviewing

plaintiff's and Prewitt's written statements, which contained several conflicting

contentions, *see* doc. 43-10 (Prewitt Report of Contact); doc. 44-2 (Plaintiff

Report of Contact), Harper issued plaintiff a Notice of Suspension on August 30,

2006, doc. 43-1, Harper EEO sworn stmt., at 10, 14-24; doc. 44-1 (Notice of

Suspension), and issued a proposed reprimand to Prewitt, which he later reduced

to counseling.  Doc. 6 ¶ 15; Doc. 43-1, Harper EEO sworn stmt., at 15.  The

difference in discipline is the basis for plaintiff's race and gender discrimination

claim.

Harper explained that he suspended plaintiff because (1) unlike Prewitt,

plaintiff had prior disciplinary issues; (2) unlike plaintiff, Prewitt immediately

reported the incident; and (3) that he judged Prewitt's account more credible.

Doc. 43-1, Harper EEO sworn stmt., at 14-24; Doc. 44-1 (Notice of Suspension).

Plaintiff admits that he has prior suspensions or reprimands, including several

from 1992 to 1999, and one in 2002.  Doc. 46, at 6 ¶ 16; Doc. 42-1, plaintiff dep.,

at 31-52; Doc. 42-3, plaintiff EEO sworn stmt., at 21; Doc. 44-5 (Records of

Disciplinary Actions Against Plaintiff).  Although plaintiff offers in opposition to

summary judgment the declarations of two pharmacy employees, Melanie Smith

and Joyce Niedermeier, who stated that they had prior verbal altercations with

Prewitt, doc. 52-1, Smith dec., at 1-2; doc. 52-3, Niedermeier dec., at 1, Harper

contends that he does not recall receiving any complaints about Prewitt before the

July 19, 2006 incident involving plaintiff.  Doc. 43-2, Harper dep., at 62-63.

### D.   *Facts Relevant to Plaintiff's Retaliation Claim: "The Second Incident" through "The Seventh Incident"*

#### 1.   *Facts Relevant to "The Second Incident"*

 "The Second Incident" occurred on August 8, 2006, when Holder told

plaintiff that he <u>may</u> have to work the late shift that evening if Holder could not

find a volunteer to fill in for the regularly-scheduled pharmacist.  Doc. 6 ¶ 19;

Doc. 42-1, plaintiff dep., at 106.  The BVAMC pharmacy is open twenty-four

hours a day.  Doc. 43-5, Holder dep., at 46-64, 86-87.  To address pharmacist

absences, if it cannot find a volunteer, the pharmacy maintains an emergency

contact list of staff pharmacists who, on a rotating basis, it calls upon to fill in for

any pharmacist who cannot work his or her scheduled shift.  Doc. 6 ¶ 19; Doc. 43-

5, Holder dep., at 46-64, 86-87.  Consistent with this practice, Holder contends

that when he learned on August 8, 2006, that the pharmacist scheduled for the late

shift could not work that night, he started asking for volunteers and, as a back up, also contacted Scott and learned that plaintiff's name was at the top of the emergency contact list.  Doc. 43-5, Holder dep., at 46-64, 86-87; Doc. 43-4, Holder EEO sworn stmt., at 7-11.  He then called plaintiff to tell him he may have to work that night.  Doc. 43-4, Holder EEO sworn stmt., at 9.

Apparently unhappy that he may have to work that evening, plaintiff contacted a union representative, who tried unsuccessfully to contact Holder. Doc. 6 ¶ 22; Doc. 42-3, plaintiff EEO sworn stmt., at 26; Doc. 43-2, Harper dep., ex. 8.  Around 4:40 p.m., Holder sent plaintiff home one hour and twenty minutes early, with pay, to give plaintiff an early break in the event he had to work the late shift.  Doc. 6 ¶ 23; Doc. 43-5, Holder dep., at 46-64, 86-87; Doc. 43-4, Holder EEO sworn stmt., at 7-11; Doc. 42-1, plaintiff dep., at 106-08.  Plaintiff contacted his union representative for the second time, doc. 6 ¶ 24; Doc. 43-2, Harper dep., ex. 9, who called Holder again and left him a voice mail message informing him of the collective bargaining agreement provision that employees receive two weeks notice prior to a change in their work schedule.  Doc. 6 ¶ 24; Doc. 43-2, Harper dep., ex. 9.  Although plaintiff never had to work that evening because Holder ultimately found a volunteer, doc. 6 ¶ 25; doc. 43-5, Holder dep., at 46-64, 86-87; doc. 43-4, Holder EEO sworn stmt., at 7-11; doc. 42-1, plaintiff dep., at 106-08,

nonetheless, plaintiff contends this is an incident of retaliation.

2.    *Facts Relevant to "The Third Incident"*

"The Third Incident" involves, in part, a hallway confrontation plaintiff had

with Harper on September 8, 2006, which resulted in a proposed suspension of ten

days ("the hallway confrontation").  Doc. 6 ¶¶ 26, 34; Doc. 42-1, plaintiff dep., at

117-21.  According to plaintiff, as he and Harper approached each other from

opposite ends of a hallway, Harper physically blocked his way, and stood in close

proximity to him for approximately three minutes before allowing him to pass.

Doc. 6 ¶¶ 27-28; Doc. 42-1, plaintiff dep., at 117-21.  Allegedly, Harper told

plaintiff that he should pass him on the right.  Doc. 42-1, plaintiff dep. at 117-21;

Doc. 43-2, Harper dep., ex. 11 (Plaintiff Report of Contact).  Harper stated that

plaintiff pulled out a tape-recorder and asked him if he was blocking the way, doc.

43-1, Harper EEO sworn stmt., at 42, which plaintiff admits, doc. 42-1, plaintiff

dep., at 121 and ex. 22.

A few days later, on September 13, 2006, for the first time since his 2002

EEO complaint, plaintiff contacted an EEO counselor regarding his August 30,

2006 suspension for workplace violence ("The First Incident") and the hallway

confrontation.  Doc. 6 ¶ 31; Doc. 44-3 (EEO Counselor's Report); Doc. 42-1,

plaintiff dep., at 27.  On October 4, 2006, the EEO officer scheduled a meeting

with Harper to discuss plaintiff's claims.  Doc. 6 ¶ 32; Doc. 43-2, Harper dep., at

91-2.

On October 10, 2006, six days after learning about plaintiff's EEO

complaint, Harper presented plaintiff with notice of a proposed ten-day suspension

based on the September 8, 2006 hallway confrontation, referencing also plaintiff's

prior five-day suspension regarding the physical altercation with Prewitt in July.

Doc. 6 ¶ 34; Doc. 43-2, Harper dep., at 92-3 and ex. 12 (Notice of Proposed

Suspension).  Harper explained the near one-month delay between the hallway

confrontation and the proposed suspension by testifying that he decided

immediately that he needed to take some action against plaintiff due to his

confrontational and insubordinate actions.  Doc. 43-3, Harper dec., at 2-3.

However, consistent with his usual practice, he discussed the incident and the

proposed discipline first with the labor relations department, which, in turn,

notified the director of the BVAMC of the proposed discipline, a process which

usually takes up to a month.  Doc. 43-3, Harper dec., at 2-3.

Harper voluntarily rescinded the proposed suspension.  Doc. 43-3, Harper

dec., at 3.  Harper acknowledged that the fact that he was both the deciding official

and the official proposing the suspension may have contributed to his decision to

withdraw it.  Doc. 43-2, Harper dep., at 93-4.  Despite the withdrawal, plaintiff

12

contends that Harper's actions constitute retaliation.

### 3.   Facts Relevant to "The Fifth Incident"

"The Fifth Incident" refers to a series of emails on October 10, 2006, between plaintiff and various BVAMC employees and supervisors, including Holder and Scott.  Doc. 6 ¶ 35, Doc. 42-1, plaintiff dep., at 131-37; Doc. 44-7 (Emails related to Fifth Incident).  That day, plaintiff sent a group email to 38 employees and supervisors complaining of low stock levels of certain drugs in the pharmacy, stating in part: "ONCE AGAIN ON MY WEEKEND . . . WE HAVE RUN OUT AND ARE CRITICALLY LOW ON SOME CRITICAL MEDICATIONS . . . WE WILL HAVE TO BORROW."  Doc. 44-7 (emphasis by plaintiff).  In response, Scott sent a "reply all" email, stating: "Eddie, I would suggest in the future to limit your accusations to the staff that can and will address these issues.  The Propofol was at and is available in the pharmacy stock.  As for the needed loan of medication, that is why we have the loan/borrow policy."  Doc. 44-7.  Holder also "replied all" to Plaintiff's email, stating in part: "Eddie, I find only one patient on levothryroxine . . . There are several 500 mcg and more appropriately a 200 mcg vial also.  Did you fail to see these on the shelf? . . . I do not see a need to borrow medications when the medicine is currently in stock in the hospital."  Doc. 44-7.  Plaintiff contends that Scott's and Holder's decisions to

send their replies to all the recipients of his original email constitute retaliation.

### 4.    Facts Relevant to "The Sixth Incident"

Although not alleged in the amended complaint, plaintiff now states as part

of "The Sixth Incident" that in early June 2008 he complained to Sfakianos and

Harper about Prewitt not doing her job.[6]  Doc. 43-7, Sfakianos dep., at 48-50 and

exs. 4, 5.  According to a witness, when Harper told plaintiff to change a

prescription for a patient, plaintiff argued and told Harper that he should assign the

task to Prewitt.  Doc. 48-3, Kendrick dep., at 21-24.  On June 5, 2008, Plaintiff

submitted a written complaint to the BVAMC administrator that Harper harassed

and subjected him to a hostile work environment, "with favoritism given to Carole

Prewitt."  Doc. 43-7, Sfakianos dep., ex. 5.

"The Sixth Incident" addressed in plaintiff's complaint is comprised of two

events.  The first is plaintiff's claim that on August 11 and 15, 2008, defendant

failed to assign a pharmacy technician to assist him for the full period of his shift

in the "fast fill vault."  Doc. 6 ¶ 38.  Because defendant dispenses narcotics from

the fast fill vault, only a limited number of technicians have clearance to work in

that area.  Doc. 44-8, Simmons dep., 18, 26, 51.  As such, the pharmacist assigned

---

[6]Plaintiff addresses this issue as part of "The Sixth Incident" in the facts section of his response brief, doc. 46, at 25-26, but addresses it as part of "The Fifth Incident" in the argument section, doc. 46, at 42-43.

to the fast fill vault is assisted only by one designated pharmacy technician.  Doc.

42-1, plaintiff dep., at 58, 138-39.  When that technician is absent, only two other

pharmacy technicians, Esther Simmons and Veronica Williams, are authorized to

fill in for her.  Doc. 42-1, plaintiff dep., at 140; Doc. 44-8, Simmons dep., at 26;

Doc. 44-9, Williams dep., at 17.  However, because Simmons and Williams also

have to perform their other regular duties, their usual practice is to assist in the

vault during the morning hours, then leave to perform their other regular duties,

but remain available in the immediate area should the fast fill pharmacist need

their assistance.  Doc. 44-8, Simmons dep., at 26, 54-61; Doc. 44-9, Williams dep.,

at 17, 26; Doc. 43-7, Sfakianos dep., at 85-93, 129-33.

        During plaintiff's August 11, 2008, assignment to the fast fill vault, because

the permanent technician was absent, doc. 42-1, plaintiff dep., at 139, Williams,

and possibly Simmons, assisted plaintiff during the morning.  Doc. 43-7,

Sfakianos dep., at 79-80 and ex. 8.  However, when that individual left to attend to

her other duties at around 10:30 or 11:00 a.m, plaintiff emailed Sfakianos for

additional help.  Doc. 43-7, Sfakianos dep., at 79-80 and ex. 8.  Sfakianos replied

the following day that "[s]taffing was adequate to meet workload demands."  Doc.

43-7, Sfakianos dep., at 79-80 and ex. 8.

        A few days later on August 15, 2008, when plaintiff again worked with

either Simmons or Williams in the fast fill vault, he emailed Sfakianos at 8:08 a.m. requesting additional help.  Doc. 43-7, Sfakianos dep., ex. 9, at 1.  Sfakianos replied that she had assigned him a technician to help him that morning, that the current workload did not warrant additional staffing, and that if he could not complete the tasks assigned to him, they could review his performance.  Doc. 43-7, Sfakianos dep., at 94-97 and ex. 9, at 1.

Simmons testified that on the days in question, she assisted plaintiff in the fast fill vault in the morning, then left to perform her other duties.  Doc. 44-8, Simmons dep., at 57-58.  However, she advised plaintiff that she was available if he needed help, and in fact, she provided help when he requested it on one of the afternoons.  Doc. 44-8, Simmons dep., at 57-59.  Simmons stated also that plaintiff received the same assistance as other pharmacists and that there was nothing unusual about the help she provided to plaintiff on those two days.  Doc. 44-8, Simmons dep., at 59-61.  Though plaintiff claims that other pharmacists have had the assistance of a fill-in pharmacy technician for their entire fast fill vault shift, he was unable to name a specific pharmacist or recall a specific occasion.  Doc. 42-1, plaintiff dep., at 146.

The second issue plaintiff recounts with regard to "The Sixth Incident" is a proposed reprimand he received for improper conduct in certain emails he sent to

Sfakianos.  Doc. 42-1, plaintiff dep., at 158; Doc. 44-10 (Plaintiff's Emails to

Sfakianos); Doc. 44-11 (Proposed Reprimand).  Plaintiff and Sfakianos exchanged

a series of emails in July and August 2008, wherein Plaintiff complained about

medication stock levels and inadequate staffing.  Doc. 6 ¶ 42.  Among other

things, plaintiff made the following statements to Sfakianos: "THE PROBLEM IS

NOT WHAT I DID BUT WHAT SOMEONE ELSE DID NOT DO.  THE

CORRECT QUESTION IS WHY WAS THE STOCK LEVEL SO LOW (DOWN

TO JUST A FEW) AND WHY HAD NONE BEEN ORDERED?" (part of an

email sent July 23, 2008); "I FOLLOWED PROCEDURE.  NOW ANSWER MY

QUESTION." (part of an email sent July 23, 2008); "IT IS YOUR

RESPONSIBILITY TO DELEGATE PHARMACY PERSONNEL IN AN

INTELLIGENT MANNER WHICH YOU DID NOT DO. . . . IT IS A SHAME

THAT MANAGEMENT IS UNABLE TO DO THEIR JOBS . . . ." (part of an

email sent August 15, 2008); "I DID NOT MISUNDERSTAND ASSIGNMENT.

YOU FAILED IN YOUR RESPONSIBILITY TO PROVIDE ADEQUATE

COVERAGE."  (part of an email sent August 22, 2008).  Doc. 44-10 (emphasis by

plaintiff).

On August 28, 2008, Sfakianos proposed a reprimand to plaintiff because

she felt that his emails were insubordinate.  Doc. 6 ¶¶ 43, 45; Doc. 43-7, Sfakianos

dep., at 109-11, 114, 116 and ex. 11 (Notice of Proposed Reprimand).  Plaintiff

contends that Sfakianos issued the proposed reprimand to retaliate against him for

his August 15, 2008 complaint to Harper charging Sfakianos with "harassment,

disparaging treatment, intimidation, and creating a hostile work environment"

based on the events in the fast fill vault on August 11, and 15, 2008.  Doc. 43-7,

Sfakianos dep., at 108 and ex. 10.

### 5.   *Facts Relevant to "The Seventh Incident"*

The only issue remaining with regard to "The Seventh Incident" concerns a

comment Sfakianos made to plaintiff about his performance on May 27, 2009, in

the presence of other pharmacy staff.[7]  Doc. 6 ¶ 49; Doc. 42-1, plaintiff dep., at

165-68.  Plaintiff is unable to recall the specific statement.  Doc. 42-1, plaintiff

dep., at 165-168.  Nor does a report of contact that plaintiff prepared describe the

specific statement.  Doc. 44-12 (Plaintiff Report of Contact).  However, plaintiff

offers the testimony of a witness who stated that Sfakianos walked up to plaintiff

and asked him in an accusatory tone why he processed so few prescriptions

between 5:00 and 6:00 p.m. the day before.  Doc. 52-4, Bradshaw dec., at 2.

Apparently, plaintiff became upset and responded that he was busy and, in fact,

---

[7]This court dismissed the other claims alleged in the "The Seventh Incident," particularly a 14-day suspension alleged at paragraph 50 of the complaint.  Doc. 19, at 13-17.

did his job.  Doc. 43-7, Sfakianos dep., at 123.

## V.  DISCUSSION

### A.    *Plaintiff Does Not Present Evidence of Material Issues of Disputed Facts Sufficient to Survive Summary Judgment on His Discrimination Claim Premised on "The First Incident"*

Plaintiff alleges that defendant violated Title VII by discriminating against him on the basis of his race and gender by subjecting him to disparate treatment — particularly, by suspending him for five days as a result of his physical altercation with Prewitt on July 19, 2006 ("The First Incident").  Because plaintiff offers only circumstantial evidence of discrimination, under the well-established *McDonnell Douglas* burden-shifting analysis, he must first create an inference of discrimination by establishing a *prima facie* case.[8]  *See Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quotation marks and citation omitted).  If he satisfies his initial burden, "the defendant must show a legitimate, non-discriminatory reason for its employment action."  *Id*.  "If it does so, then the plaintiff must prove that the reason provided by the defendant is a pretext for unlawful discrimination."  *Id*.  However, "[t]he ultimate burden of

---

[8]Defendant concedes that plaintiff has "likely" met his burden of establishing a *prima facie* case.  Doc. 40, at 24.  The court agrees.  Plaintiff has shown that as a result of his altercation with Prewitt, defendant treated Prewitt, an African-American female, more favorably by issuing her a reprimand instead of also suspending her.  Therefore, the only issue the parties disagree on is whether defendant's articulated reasons are a pretext for unlawful discrimination.

persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Springer v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007) (quotation marks and citation omitted).

> 1. *Plaintiff's discrimination claim fails because he has not established that defendant's legitimate, non-discriminatory reasons for plaintiff's suspension are a pretext for unlawful race and gender discrimination.*

Summary judgment is warranted because plaintiff cannot overcome the legitimate, non-discriminatory reasons for his suspension. Specifically, defendant has presented evidence that Harper suspended plaintiff for three reasons. First, unlike Prewitt, Harper had knowledge of plaintiff's prior disciplinary history. Doc. 43-1, Harper EEO sworn stmt., at 14-24; Doc. 44-1 (Notice of Suspension). Second, unlike Prewitt who promptly reported the incident to her supervisor as required by the workplace policy, plaintiff only submitted a report the following day when Scott asked him to do so in response to Prewitt's report. Doc. 43-1, Harper EEO sworn stmt., at 22; Doc. 44-1 (Notice of Suspension); Doc. 43-11 (Workplace Violence Prevention Policy). Third, Harper judged Prewitt's account more credible—namely, she concluded that plaintiff was the aggressor in the situation. Doc. 43-1, Harper EEO sworn stmt., at 22-24; Doc. 44-1 (Notice of

Suspension).  These three reasons sufficiently satisfy defendant's burden of articulating non-discriminatory reasons, a burden courts have characterized as "exceedingly light."  *See Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994).  Defendant's reasons also satisfy the Supreme Court's standard that "the defendant's explanation of its legitimate reasons [] be clear and reasonably specific" so that "the plaintiff be afforded a full and fair opportunity to demonstrate pretext."  *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

Once an employer offers a legitimate reason, the plaintiff "must meet the reason proffered head on and rebut it."  *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) (citations omitted).  Significantly, "[f]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'"  *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).  Rather, as the Eleventh Circuit has often emphasized:  "'No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [federal law] does not interfere.  Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior.'"  *Id*.  Instead, the court "must evaluate whether the

21

plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001) (citations and internal quotation marks omitted).

Here, to show pretext, plaintiff asserts that Harper did not offer plaintiff's prior disciplinary history as a reason for his suspension during Harper's April 29, 2009 deposition, and only did so in a declaration Harper submitted two years later. Doc. 46, at 34. The record, however, belies plaintiff's contention. Specifically, Harper, in fact, testified in his deposition that he considered a prior incident between plaintiff and another employee, Ms. Sims, in deciding to suspend plaintiff for the incident with Prewitt. Doc. 43-2, Harper dep., at 97-8. Moreover, Harper stated in sworn testimony to an EEO investigator on May 25, 2007 that he considered plaintiff's disciplinary history, including a verbal exchange with a co-worker that had occurred a few months prior. Doc. 43-1, Harper EEO sworn stmt., at 14-16. In other words, the court finds neither inconsistencies nor contradictions in Harper's testimony.[9] Significantly, Plaintiff admitted that he had prior

---

[9]Further, Harper's reliance, in part, on an incident only a few months old contradicts plaintiff's assertion that Harper inappropriately relied on discipline plaintiff received in 1999. Doc. 46, at 34.

disciplinary issues before the incident with Prewitt, including several between 1992 and 1999, and another in 2002.  Doc. 46, at 6 ¶ 16; Doc. 42-1, plaintiff dep., at 31-52; Doc. 42-3, plaintiff EEO sworn stmt., at 21; Doc. 44-5 (Records of Disciplinary Actions against Plaintiff).[10]

Additionally, the record also does not support plaintiff's contention that Harper had knowledge of Prewitt's prior run-ins with co-workers.  To support this contention, plaintiff offers the testimony of two employees who claim they had verbal disputes with Prewitt in the past.  Doc. 52-1, Smith dec., at 1-2; Doc. 52-3, Niedermeier dec., at 1.  One employee stated that Prewitt "snapped" at her in February 2006 and that she reported it to Sfakianos, doc. 52-1, Smith dec., at 2, and the other recalled Prewitt making inappropriate comments towards her at some unspecified time in the past, which she reported to either Holder or Harper, doc. 52-3, Neidermeier dec., at 1.  However, plaintiff's suggestion that Harper ignored Prewitt's prior issues is unfounded because plaintiff has not presented credible evidence that Harper had knowledge of any prior complaints against Prewitt.  At best, one of plaintiff's witnesses stated she may have reported Prewitt to Harper,

---

[10]Plaintiff asserts also that his physical evidence file at the time of his suspension was empty.  Doc. 42-3, plaintiff EEO sworn stmt., at 17-23.  In light of plaintiff's admission that defendant, in fact, previously disciplined him, this fact is irrelevant to the issue of whether Harper is truthful in his assertions that he relied on plaintiff's history of disciplinary problems.

but added that it could have been Holder.  Doc. 52-3, Neidermeier dec., at 1.  This

evidence simply does not rise to the level necessary to establish pretext.  Indeed,

Harper testified that he had no knowledge of any complaints against Prewitt when

he made the decision to suspend plaintiff, doc. 43-2, Harper dep., at 62-63, a fact

that plaintiff acknowledged, doc. 46, at 16 ¶ 21.[11]

Moreover, plaintiff's focus on Prewitt's purported run-ins ignores the other

reasons Harper articulated.  For example, plaintiff admitted that, unlike Prewitt,

who followed policy and reported the incident, he only submitted an incident

report the next day, when asked.  Doc. 42-1, plaintiff dep., at 80-81; Doc. 42-3,

plaintiff EEO sworn stmt., at 49-51.  Likewise, he does not address Harper's

contention that he found Prewitt more credible.  Harper does not have to be right

on his credibility determinations; rather, he only needs to have a reasonable basis

for his conclusion, which he did her in light of plaintiff's track record and

plaintiff's failure to report Prewitt.  *See Jones v. Gerwens*, 874 F.2d 1534, 1540

(11th Cir. 1989) ("The law is clear that, even if a Title VII claimant did not in fact

commit the violation with which he is charged, an employer successfully rebuts

---

[11]Plaintiff asserts also that Prewitt later changed her account of the incident, implying that Harper should not have trusted her version of events.  An examination of Prewitt's written reports of the incident reveals that she merely added additional information, such as the fact that she began experiencing soreness the day after the incident.  *See* Doc. 43-2, Harper dep., ex. 5.

any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.") (citation omitted).  Moreover, plaintiff's failure to rebut <u>all</u> of defendant's articulated reasons is fatal to his claim.  *See Crawford*, 482 F.3d at 1308 ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut *each* of the reasons to survive a motion for summary judgment.") (emphasis added).

Most significantly, plaintiff offers no facts indicating that discriminatory animus factored into Harper's decision to suspend him, other than to state that Prewitt is African-American and female.  Doc. 42-1, plaintiff dep., at 85-86; Doc. 42-3, plaintiff EEO sworn stmt., at 23.  To prevail, plaintiff must not only show that the reasons defendant presented are false but also that "*discrimination is the real reason*" for the adverse action taken.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis added).  *See also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) ("Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions.") (citation omitted).  On this record, the court finds that plaintiff failed to rebut defendant's articulated reasons for his suspension.  Therefore, his discrimination claim fails.

25

B.     ***Plaintiff Does Not Present Evidence of Material Issues of Disputed Facts Sufficient to Survive Summary Judgment on His Retaliation Claim***

With regard to the remaining incidents, i.e., "The Second Incident" through "The Seventh Incident," plaintiff contends that these actions, taken together, constitute unlawful retaliation for protected activity.  "To establish a claim of retaliation under Title VII [], a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citation omitted).  "After the plaintiff has established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability."  *Id*. (citing *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073, 1075 n.54 (11th Cir. 1995)).  "The plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct." *Goldsmith*, 513 F.3d at 1277 (citation omitted).  As discussed below, plaintiff's retaliation claim fails because he has not established a *prima facie* case and/or failed to rebut defendant's articulated reasons.  For the sake of clarity, the court will address each incident in turn.

###### 1.    *"The Second Incident"*

Plaintiff has abandoned his retaliation claim with regard to the facts that make up "The Second Incident" by failing to address them in his brief.  Doc. 46, at 38 ("The Plaintiff identifies at least eight incidences (Incidents 3-7) which make up adverse personnel/employment actions which constitute harassment and retaliation.").  *See Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (issues not argued are deemed abandoned).  Even if plaintiff has not abandoned "The Second Incident," it is questionable whether informing him that he *may* have to work a late shift, when, as here, he never actually worked the late shift, rises to the level of a materially adverse employment action.  While plaintiff is obviously unhappy that his employer has a contingency plan to address absences, "the protections of Title VII simply do not extend to 'everything that makes an employee unhappy.'"  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1242 (11th Cir. 2001) (citation omitted).  *See also Burlington Northern & Santa Fe Railroad Co. v. White*, 548 U.S. 53, 68 (2006) (holding that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination'")

(citations omitted).  Moreover, the lengthy interval of time between this incident in August 2006 and plaintiff's last protected EEO activity in July 2002 is too remote to satisfy the causation element of the *prima facie* case.  The law in the Eleventh Circuit is clear that "[i]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law."  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).  A lapse of time of over a year between the protected conduct and the adverse action alleged is generally too great to constitute circumstantial evidence of causation.  *See, e.g., Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).  In short, if plaintiff has not abandoned his retaliation claim with regard to "The Second Incident," he fails to make out the *prima facie* case necessary to succeed on the claim and/or cannot show that defendant's articulated reason, i.e., the need to have a contingency plan to fill shifts in emergencies, is pretextual.

2.	*"The Third Incident"*

To the extent plaintiff contends that Harper's actions in the hallway on September 8, 2006 constitute a materially adverse employment action taken in retaliation for his protected activity, plaintiff fails to establish a *prima facie* case. Plaintiff has presented no evidence of a causal relationship between his last EEO

28

activity, which occurred over four years prior, and Harper's conduct. *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (to show a causal relationship, the plaintiff must show that the decision maker was aware of the protected activity, and that the protected activity and the adverse action were not wholly unrelated). The lack of close temporal proximity is fatal to plaintiff's retaliation claim insofar as it is premised on the hallway confrontation. *See Breeden*, 532 U.S. at 273-74; *Thomas*, 506 F.3d at 1364.

Moreover, that portion of plaintiff's retaliation claim premised on the remaining events described in "The Third Incident," which is the proposed ten-day suspension plaintiff received from Harper as a result of the hallway confrontation and other issues, also fails because plaintiff has not rebutted defendant's articulated reasons. It is undisputed that plaintiff initiated contact with an EEO counselor on September 13, 2006, regarding his August 30, 2006 suspension for the altercation with Prewitt ("The First Incident") as well as the hallway confrontation with Harper. Doc. 44-3 (EEO Counselor's Report). It is also undisputed that the EEO counselor notified Harper about plaintiff's charges on October 4, 2006, some eight days <u>before</u> Harper presented plaintiff with the proposed suspension. Doc. 43-2, Harper dep., at 91-93 and ex. 12. As such, plaintiff has satisfied the causation

element of the *prima facie* case.[12]  *See Higdon v. Jackson*, 393 F.3d 1211, 1220

(11th Cir. 2004) ("mere temporal proximity between . . . knowledge of protected

activity and an adverse . . . action . . . must be 'very close'") (citations omitted).

Defendant asserts that plaintiff's claim fails because he cannot rebut its

legitimate, non-retaliatory reasons.  Specifically, defendant contends that Harper

denied that he proposed the suspension in retaliation for Plaintiff's protected

activity and explained that he proposed it because he "determined that some action

needed to be taken against [plaintiff] due to the confrontational and insubordinate

nature of his actions during that incident" and because of plaintiff's history of

disciplinary issues going back to 1992.  Doc. 43-3, Harper dec., at 2-3.  Also,

Harper explained that the length of time between the hallway confrontation and the

proposed suspension is due to his practice of routinely discussing workplace

incidents and proposed discipline with the labor relations department, and then

notifying the director so that he or she is aware of the proposed discipline.  Doc.

43-3, Harper dec., at 2-3.  Harper stated that this process often takes up to a month.

Doc. 43-3, Harper dec., at 2-3.  By offering this reason for the timing of plaintiff's

---

[12]Although defendant does not argue directly that plaintiff has not established a *prima facie* case of retaliation with regard to the proposed ten-day suspension, defendant suggests that a proposed suspension that it ultimately withdrew may not constitute an adverse employment action.  In any event, the court need not decide that issue because it finds that even if plaintiff has established a *prima facie* case, he fails to rebut defendant's articulated reasons.

suspension, defendant has met its burden of production.

To show pretext, plaintiff contends first that Harper gave contradictory reasons during his deposition and in his signed declaration for the one-month delay. However, Harper was not questioned about the delay during his deposition, doc. 43-2, Harper dep., at 90-95, and, accordingly, is free to explain his reasons in his declaration. *See* Doc. 43-3, Harper dec., at 2-3. Next, plaintiff asserts that Harper failed to realize the inherent conflict in being both the deciding official and the proposing official on Plaintiff's suspension. Again, the record refutes this contention because Harper acknowledged in his deposition that the conflict of interest may have factored into his decision to withdraw the suspension. Doc. 43-2, Harper dep., at 94.

Plaintiff's only other method of showing pretext is to rely on the close timing of the facts alleged in the *prima facie* case. The Eleventh Circuit has stated that "a plaintiff may not in all cases merely rest on the laurels of [his] prima facie case in the face of powerful justification evidence offered by the defendant." *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir. 1987). Harper explained why he proposed some form of discipline, as well as why the process took nearly a month, and plaintiff has presented no evidence that this explanation is dishonest. *See Chapman*, 229 F.3d at 1030. Accordingly, summary judgment is warranted on

plaintiff's retaliation claim insofar as it is premised on the October 12, 2006

proposed suspension that Harper later withdrew.

          3.      *"The Fifth Incident"*

      Plaintiff contends next that Holder and Scott retaliated against him on

October 10, 2006, by sending their responses to an email plaintiff sent to all

pharmacy staff members included in plaintiff's original email.  While the emails are

mildly critical of plaintiff's actions and were indeed a "reply all," they do not

constitute a materially adverse employment action necessary to support a *prima*

*facie* retaliation claim.  Title VII is "neither a general civility code nor a statute

making actionable the 'ordinary tribulations of the workplace.'"  *Davis*, 245 F.3d at

1239 (quoting *Gupta*, 212 F.3d at 587) (internal quotation marks omitted).  Again,

the Eleventh Circuit has stated, "An employee who receives criticism or a negative

evaluation may lose self-esteem and conceivably may suffer a loss of prestige in

the eyes of others who come to be aware of the evaluation.  But the protections of

Title VII simply do not extend to 'everything that makes an employee unhappy.'"

*Davis*, 245 F.3d at 1242 (citation omitted).  Moreover, plaintiff has presented no

evidence that Scott or Holder, the individuals who sent the emails, knew when they

replied to all that plaintiff contacted an EEO counselor to make charges against

Harper on September 13, 2006.  This lack of evidence on knowledge is fatal to

plaintiff's *prima facie* case because a "decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. Bellsouth Telecomm.*, 231 F.3d 791, 799 (11th Cir. 2000).  Accordingly, plaintiff has not established a *prima facie* case of retaliation with regard to the "The Fifth Incident."

> 4.     *"The Sixth Incident"*

Plaintiff fares no better with his contention that Sfakianos's refusal to provide him with a pharmacy technician to assist him for the entirety of his shift in the fast fill vault on August 11 and 15, 2008, is a retaliatory employment action. While plaintiff offers no argument as to which protected activity prompted Sfakianos's allegedly retaliatory conduct, doc. 46, at 45, presumably, he is referring to his EEO activity nearly two years earlier, in September 2006, when he made allegations of discrimination and retaliation against Harper, doc 6 ¶ 31; doc. 42-1, plaintiff dep., at 27; doc. 44-3 (EEO Counselor's Report), or his report of contact to the administrator of the BVAMC in early June 2008, accusing Harper of harassment and showing favoritism towards Prewitt.  Doc. 43-7, Sfakianos dep., ex. 5.  There is no question that Title VII protects not just "individuals who have filed formal complaints," but also those "who informally voice complaints to their superiors or who use their employers' internal grievance procedures." *Rollins v. Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) (per curiam).

33

However, plaintiff's June 2008 report of contact charged Harper with harassment, not Sfakianos, and plaintiff presents no evidence that Sfakianos knew about his complaint.  Indeed, when questioned during her deposition, Sfakianos stated that she did not recall whether she ever saw plaintiff's report against Harper.  Doc. 43-7, Sfakianos dep., at 52.  As plaintiff offers no other evidence of causation, he failed to establish the causation element of his *prima facie* case.  *See Breeden*, 532 U.S. at 273-74; *Thomas*, 506 F.3d at 1364.

Moreover, the record undermines plaintiff's claim that a reasonable employee would consider Sfakianos's actions materially adverse.  *See Burlington Northern*, 548 U.S. at 68.  Plaintiff admits that on August 11 and 15, 2008, the regular technician was absent and that Williams or Simmons assisted him for part of his shift.  Doc. 42-1, plaintiff dep., at 138-143.  Moreover, according to Williams and Simmons, on days when they fill in for the regular technician, their usual practice is to fill in in the fast fill vault in the morning, return to their work stations to fulfill their regular duties, and to remain available to assist if needed in the vault.  Doc. 44-8, Simmons dep., at 26, 54-61; Doc. 44-9, Williams dep., at 17, 26.  Indeed, Simmons testified further that on August 11 and 15, 2008, she assisted plaintiff in the morning, remained available in the afternoon, and in fact assisted plaintiff that afternoon when he requested it.  Doc. 44-8, Simmons dep., at 57-61.

34

Though plaintiff asserts that other staff pharmacists had the assistance of a technician for their entire shift on days when the regular technician is absent, he could not name a specific pharmacist or recall a specific occasion to support this claim. Doc. 42-1, plaintiff dep., at 146. The court can only glean from the record that defendant afforded plaintiff the same staffing as other staff pharmacists assigned to the fast fill vault, and as such, plaintiff cannot establish any adverse treatment.

Further, Sfakianos explained that she replied to plaintiff's emails requesting additional help as she did because she believed that the workload on those two days did not trigger a need for additional help. Doc. 43-7, Sfakianos dep., at 99. Importantly, this court's inquiry is limited to ascertaining whether "the employer gave an honest explanation of its behavior," rather than reexamining the fairness of the decision. *Chapman*, 229 F.3d at 1030. Plaintiff has offered no evidence to suggest that Sfakianos's explanation is dishonest. In short, plaintiff has not offered substantially probative evidence that retaliation more likely than not motivated Sfakianos's actions here.

The court now turns to the second allegedly retaliatory act described in "The Sixth Incident," which is a reprimand Sfakianos proposed against plaintiff on August 29, 2008, as a result of improper conduct in several emails he sent to

35

Sfakianos in July and August 2008.  Doc. 42-1, plaintiff dep., at 158; Doc. 44-10

(Plaintiff's Emails to Sfakianos); Doc. 44-11 (Proposed Reprimand).  Sfakianos

proposed the reprimand roughly two weeks after plaintiff submitted a report of

contact to Harper on August 15, 2008, charging Sfakianos with "harassment,

disparaging treatment, intimidation, and creating a hostile work environment"

based on the events in the fast fill vault on August 11 and 15, 2008.  Doc. 43-7,

Sfakianos dep., at 108 and ex. 10.  Plaintiff contends that Sfakianos issued the

proposed reprimand in retaliation for the harassment charge.

Assuming that plaintiff's internal report of contact is protected activity, *see*

*Rollins*, 868 F.2d at 400, and taking into account the short temporal proximity

between the harassment charge and the proposed reprimand, plaintiff's retaliation

claim nonetheless fails as it relates to this reprimand because he offers no evidence

to rebut Sfakianos's legitimate reason for proposing the reprimand, i.e., she felt that

plaintiff's emails were inappropriate to send to a supervisor.  Doc. 43-7, Sfakianos

dep., at 114, 116, 134, and ex. 11 (Notice of Proposed Reprimand).  Other than the

fact that he had engaged in protected activity prior to the reprimand, plaintiff has

not offered any other fact to support his contention that retaliatory animus

motivated Sfakianos's actions as they relate to the emails.  Plaintiff's *prima facie*

case raises an inference of retaliation only because the court presumes the acts

alleged, "'*if otherwise unexplained*, are more likely than not based on the consideration of impermissible factors.'" *Grigsby*, 821 F.2d at 595 (citation omitted).  Here, however, Sfakianos has explained her actions, and plaintiff has not rebutted her explanation.  Accordingly, plaintiff's retaliation claim premised on "The Sixth Incident" fails.

>    5.    *"The Seventh Incident"*

Plaintiff's final retaliation contention concerns the verbal counseling he received from Sfakianos on May 27, 2009, in the presence of other pharmacy staff. Taken in the light most favorable to plaintiff, the record indicates that Sfakianos criticized plaintiff's productivity during a specific period of time the previous day. *See* Doc. 52-4, Bradshaw dec., at 2.  Sfakianos may indeed be a bad supervisor for counseling an employee in a non-private setting, and as such, her comment probably embarrassed and angered plaintiff.  However, this court is not charged with correcting supervisors' management styles.  Moreover, the court finds that Sfakianos's comment is not an actionable adverse employment action, but rather, it is akin to "those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68.  *See also Crawford v. Carroll*, 529 F.3d 961, 973 n.13 (11th Cir. 2008) (petty and trivial actions against an employee are not materially adverse).  Furthermore, the roughly nine-month

interval between Sfakianos's comment and plaintiff's last protected activity, which was presumably his report of contact to Harper on August 15, 2008 charging Sfakianos with harassment, undermines plaintiff's *prima facie* case. *See Thomas*, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough [to establish the causation element].").

However, even if plaintiff can raise an inference of retaliation, Sfakianos has articulated a legitimate reason for asking plaintiff why he processed so few prescriptions the previous day. According to Sfakianos, when she reviewed the previous day's workload reports, she noticed that plaintiff only processed three order-entry prescriptions between 5:00 p.m. and 6:00 p.m. Doc. 43-7, Sfakianos dep., at 118. She then discovered that plaintiff was assigned to a different task—filling prescriptions in the front vault—during that period of time, an area that she knew was very busy that day. Doc. 43-7, Sfakianos dep., at 118-124. She stated that she asked plaintiff why he processed so few prescriptions in order to confirm that it was because he was "swamped in the front vault." Doc. 43-7, Sfakianos dep., at 122-23.

Significantly, plaintiff has offered no facts indicating that retaliatory animus caused Sfakianos to make the comment. Absent such evidence, his assertions to

the contrary are rank speculation with no evidentiary value.  *See Cordoba v.*

*Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("'Speculation does not

create a genuine issue of fact; instead, it creates a false issue, the demolition of

which is a primary goal of summary judgment.'") (citation omitted).[13]

> 6.   *Plaintiff's retaliation claim fails because he has not established*
> *that any of defendant's actions in "The Second Incident"*
> *through "The Seventh Incident" were performed in retaliation*
> *for protected activity.*

It is clear that plaintiff believes defendant has mistreated him, as he has

engaged in three instances of protected activity during the years 2006 to 2009[14] and

alleges as many as seven adverse employment actions.  But on the record here,

plaintiff has failed to establish that defendant took any of the actions at issue here

in retaliation for his protected activity.  As such, plaintiff's reliance on *Shannon v.*

*BellSouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002), for the

proposition that this court may consider the collective total weight of all of the

---

[13]Presumably to show pretext, plaintiff states: "It is particularly relevant that Sfakianos disciplined the plaintiff for his reaction to her professionally inappropriate question.  She got what she wanted."  Doc. 46, at 47.  The court can only assume that plaintiff is referring to the proposed 14-day suspension he later received, doc. 6 ¶ 49, and which the court previously dismissed.  Doc. 20.  Plaintiff may not bolster his retaliation claim by relying on a claim that could not survive a motion to dismiss.

[14]These are the September 16, 2006 contact with the EEO counselor, doc. 44-3, and the accusations of harassment on June 5, 2008 against Harper, doc. 43-7, Sfakianos dep., ex. 5, and against Sfakianos on August 15, 2008, doc. 43-7, Sfakianos dep., at 108 and ex. 10.

actions alleged as one adverse employment action, does not save his retaliation claim, because of his failure to establish that retaliatory animus motivated defendant in taking <u>any</u> of the actions alleged.

## VI.  CONCLUSION

Having determined that there are no genuine issues of disputed fact for trial, the court hereby grants summary judgment in favor of defendant on all counts and dismisses this case with prejudice.

DONE this 29th day of July, 2011.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE